419 So.2d 1363 (1982)
Lillie WILLIAMS
v.
FNBC ACCEPTANCE CORPORATION.
81-664.
Supreme Court of Alabama.
September 17, 1982.
*1364 David S. Yen, for Legal Services Corp. of Alabama, Opelika, for appellant.
Larry W. Roney, Phenix City, for appellee.
JONES, Justice.
Plaintiff/Appellant Lillie Williams, an 81-year-old widow, instituted this action, seeking, inter alia: (1) rescission of a deed, pursuant to Code 1975, § 8-9-12, by which she had conveyed all interest in her homeplace to Curtis Walton, a material portion of the consideration being Walton's pledge to support and care for her during her lifetime; and (2) declaratory relief to the effect that a mortgage purportedly executed by Mrs. Williams and Walton to Builders Supply of Georgia, Inc. (later assigned to FNBC), was void because Mrs. Williams had rescinded it pursuant to the Federal Truth In Lending Act and/or her purported signature thereon was a forgery.
A portion of the trial court's order recites the following pertinent facts:
"Upon consideration thereof, the Court finds as follows:
"1. That the plaintiff conveyed her home to the defendant, Curtis Walton, by warranty deed on October 9, 1979. That a material part of the consideration of this conveyance was an agreement on the part of Curtis Walton to support plaintiff for the remainder of her life, which he did not do.[1]
"2. That on December 5, 1979, Builders Supply of Georgia, Inc., contracted with the defendant, Curtis Walton, to make home improvements on the property conveyed to him by the plaintiff, and the defendant, Curtis Walton, executed a mortgage and other instruments securing a loan of $18,774.00 made on the property. That the plaintiff was named on the mortgage but denies that she executed any mortgage or that she had direct dealing with Builders Supply of Georgia, Inc.
"3. That Builders Supply of Georgia, Inc., performed the improvements contracted for, including the pay off of a first mortgage then outstanding on said property made by the plaintiff to First Federal Savings and Loan Association of Russell County, Alabama.
"4. That on or about December 14, 1979, Builders Supply of Georgia, Inc., assigned their interest in the home improvement contract and mortgage to the defendant, FNBC Acceptance Corporation."
Walton vacated Mrs. Williams's home in the early part of 1980, leaving her with the outstanding mortgage held by FNBC. Walton has since failed to return or to contact Mrs. Williams.
In October and November of 1980, FNBC published a notice of mortgage foreclosure sale of Mrs. Williams's home. Thereafter, Mrs. Williams sought to rescind the home improvement transaction pursuant to provisions of the Federal Truth In Lending Act. FNBC objected to any rescission efforts; whereupon, Mrs. Williams sought a temporary restraining order forbidding the foreclosure sale. This relief was denied, and the sale was held on December 2, 1980.
The decree then makes certain conclusionary findings:
"5. That the defendant, Curtis Walton, who had been taken into the care of the plaintiff when he was four years old, had the authority of the plaintiff, after she made the warranty deed conveyance to him, to do `whatever he wanted to do, he could do.'

*1365 "6. [Herein the court recites its earlier order denying Mrs. Williams's motion for T.R.O.]
"7. That notices by Builders Supply of Georgia, Inc., through the defendant, Curtis Walton, required under the Federal Truth in Lending Act was sufficient compliance with statutory requirements against the defendants herein."
The trial court's ultimate holding, following a nonjury trial, is expressed in the following portion of the final decree:
"It is, therefore,
"ORDERED, ADJUDGED, AND DECREED BY THE COURT AS FOLLOWS:
"1. That the conveyance from Lillie Williams ... to Curtis Walton ... as shown by deed recorded in Volume 576, Page 70 in the office of the Judge of Probate of Russell County, Alabama, is void and is the property of [Lillie Williams] subject, however, to the intervening rights of the assignee of the original mortgage [FNBC].
"2. That [Lillie Williams's] prayer for actual damages, statutory damages, plaintiff's costs, reasonable attorneys fees, and other relief prayed for is denied by the Court, the Court finding for the defendant in these regards.
"3. That [Lillie Williams] is entitled to such statutory redemption as may be allowed under the laws of the State of Alabama."
Mrs. Williams's statement of the issues presented may be divided into two broad categories:
1. Given the invalidity of the Williams-to-Walton deed, the propriety of the court's order declaring FNBC a bona fide purchaser for value[2] within the exception of § 8-9-12, where FNBC did not rely upon Walton's status as the sole mortgagor, but, instead, treated Mrs. Williams as a co-owner of the mortgaged property; and
2. The propriety of the court's order declining to declare Mrs. Williams's status as one entitled to "Truth-In-Lending" protection, where FNBC and its assignor treated her as one to whom credit was extended despite the forgery of her name on the security document.
We pretermit resolution of issue number 1, and reverse and remand as to issue number 2.
Although our holding of reversal as to issue number 2 renders our answer to issue number 1 unnecessary, we will summarize Appellant's contentions with respect thereto because of their relationship, factually and legally, to the truth-in-lending issue. For the sake of clarity, we have taken the liberty of adding the names of the parties in the following excerpt from Appellant's brief:
"The exception in Code of Ala. (1975) § 8-9-12 is for the protection of [Builders Supply and FNBC] who gave value to [Curtis Walton], in reliance on [Walton's] interest in the realty conveyed, as shown by the deed, regular on its face and duly recorded, without notice that the deed is voidable because a material consideration for the deed was a promise to support [Mrs. Williams] during [her] life. FNBC had no [actual] knowledge of the deed [to Curtis] and did not rely on the deed in deciding to purchase the contract from Builders Supply. Since FNBC had no knowledge of the deed, it is not ... entitled to the protection due to a bona fide purchaser.
"FNBC can not claim protected status for its mortgage based on a lack of knowledge of the voidability of the deed [because it] believed that it had a mortgage signed by the owners of the property, Lillie Williams and Curtis Walton. [FNBC] did not believe that it had a valid mortgage solely because its mortgage was signed by Curtis Walton, as it believed that he was not the sole owner of the property."
*1366 Initially, in aid of our understanding of Appellant's first contention, we need to examine FNBC's insistence that, notwithstanding the trial court's setting aside of the Williams-to-Walton deed for failure of consideration pursuant to § 8-9-12, FNBC, having no notice of the continuing support element of the consideration, falls within the bona fide purchaser for value exception. Because Walton, in fact, was the record title holder, says FNBC, only his signature on the mortgage (as well as the truth-in-lending documents) was essential to the passing of title; and neither the subsequent voiding of the Williams-to-Walton deed nor Walton's forgery of Mrs. Williams's name to the mortgage altered FNBC's status as a bona fide purchaser for value.
Appellant counters by pointing out that FNBC accepted Mrs. Williams's signature as both genuine and essential to the mortgage conveyance. FNBC did not treat Walton as the sole owner as contemplated by the bona fide purchaser for value statutory exception. Appellant insists that FNBC, not having relied upon Walton's sole ownership, can not now invoke a statute which has as its purpose the protection of a grantee who, without notice, deals with the record title holder whose title is subsequently defeated for failure of consideration. (Mrs. Williams is correct in her assertion that the evidence is without dispute that both Builders Supply and FNBC believed Williams and Walton owned the property jointly, thus requiring both signatures on the mortgage as well as on the truth-in-lending documents.)
As pointed out earlier, our capsule of the parties' contentions with respect to FNBC's status as a bona fide purchaser for value is not for the purpose of our disposition of that issue; rather, we have set out their respective contentions, because of their relationship to, as well as their aid to our understanding of, the truth-in-lending issue.
While, in many aspects, the two issues differ materially (one dealing with a state property statute and the other with a federal disclosure statute), there is a thread of commonality running through Appellant's challenge to the trial court's adverse rulings on both issues. This common element finds its source in Appellant's contention that FNBC, in effect, is taking inconsistent positions. That is, FNBC, on the one hand, treats Mrs. Williams as a grantor and obligor; while, on the other hand, FNBC says that she is neither grantor nor obligor. The essence of Appellant's argument is that FNBC can not have it both ways.
Focusing specifically on the truth-in-lending issue, Mrs. Williams says, in effect, that she was "the person to whom credit is extended"one of the coverage clauses of the federal legislation. Having treated Mrs. Williams as one who occupied truth in lending status, FNBC, she says, cannot stand behind the invalidity of her signature as the basis for its changed position that she was not one to whom this protection was due.
Here, again, our understanding of Appellant's second contention is enhanced by our examination of FNBC's position with respect to the truth in lending issue.
FNBC does not claim, nor will the record support a contention, that its assignee status abrogated its duty of direct compliance with the mandates of the Truth In Lending Act. FNBC's only reference in brief to this issue is contained in its "Statement of Facts," reciting the trial court's conclusionary finding that:
"[N]otices by Builders Supply of Georgia, Inc., through the Defendant, Curtis Walton, required under the Federal Truth In Lending Act was sufficient compliance with statutory requirements against the Defendant herein."
We do not understand this to mean either that the truth in lending obligation was solely upon Builders Supply or that the single copy furnished to Walton met the truth in lending requirement in the event Mrs. Williams was entitled to a copy of the documents. Rather, we accept this statement from Appellee's brief, consistent with the record, in furtherance of FNBC's contention that Mrs. Williams, because of the forgery, was not a party in fact to the loan transaction, and, thus, not entitled to the *1367 protection of the truth in lending provisions.
Implicit in Appellant's argument is a two-fold attack on the trial court's denial of her truth in lending claim: Either 1) the circumstances of FNBC's conduct toward Mrs. Williams (treating her as an obligor) created an affirmative duty upon FNBC for truth in lending compliance, even though she had not, in fact, signed the contract; or 2) FNBC's insistence and reliance upon the necessity of Mrs. Williams's signature on the mortgage, as well as the truth in lending documents, estops FNBC from now denying that she was one to whom truth in lending compliance was due.
Although the affirmative duty argument is a compelling one, we reject it as unsound. As a matter of law, Mrs. Williams was either an obligated party under the mortgage and mortgage note or she was not. FNBC's perception of her rights and obligations, with regard to the mortgage indebtedness, could not, and did not, change her legal status. Thus, we hold that FNBC, through its conduct, did not affirmatively assume the status of a "creditor" with respect to Mrs. Williams, because she was not an obligated party pursuant to the mortgage bearing her forged signature.
The doctrine of estoppel, on the other hand, is an entirely different matter. It is a principle of equity that operates not to create a right nor to impose an obligation, but to prevent an otherwise unjust result. Indeed, it proceeds on the absence of such right or obligation, and comes into play where a party takes a position in one instance inconsistent with that party's position in another instance, to another's prejudice. U.S. Fidelity & Guaranty Co. v. McKinnon, 356 So.2d 600 (Ala.1978); Carolina Casualty Insurance Co. v. Tisdale, 46 Ala.App. 50, 237 So.2d 855 (1970).
"The purpose of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders [that assertion] contrary to equity and good conscience. Mazer v. Jackson Ins. Agency, 340 So.2d 770 (Ala.1976); First National Bank of Opp v. Boles, 231 Ala. 473, 165 So. 586 (1936)." Draughon v. General Finance Credit Corporation, 362 So.2d 880, 884 (Ala.1978).
We hold that the very facts which prevent the creation of an affirmative legal duty on the part of FNBC to comply with the Truth In Lending Act invoke the doctrine of equitable estoppel, barring FNBC's assertion that Mrs. Williams was not one to whom it owed truth in lending compliance.
The rationale for our estoppel holding finds its roots in the beneficient purpose of 15 U.S.C. § 1601, et seq., and implementing regulations, as applied to the peculiar facts of this case. At some risk of over-simplification, we summarize this body of remedial law: The Truth In Lending Act provides that disclosure statements and notice of right of rescission, in a multi-customer, rescindable transaction, must be given to all customers having the right to rescind.[3] It is without contest in the record that Mrs. Williams was not furnished either a disclosure statement or notice of right of rescission, both being furnished only to Walton.
As to who has the right to rescind, 15 U.S.C. § 1635 (1970), expressly provides:
"Except as otherwise provided in this section, in the case of any consumer credit transaction including opening or increasing the credit limit for an open end credit plan in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this *1368 section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section."
Except for the forgery of Mrs. Williams's signature, then, the Truth In Lending Act mandates that she be furnished disclosure statements and notice of right of rescission. FNBC says, however, that because of the forgery (or, given the forgery), the entire transaction may now be treated as though Mrs. Williams was not involved. The trial court obviously agreed; and pursuant to such finding, the trial court implicitly held that because FNBC could have dealt only with Walton as the sole owner of the pledged property, once the forgery of Mrs. Williams's signature was established, no further consideration need be given to her truth-in-lending rights.
The flaw in FNBC's reasoning is dramatized in the following excerpt from its vice-president's testimony:
"Q. Tell us the nature of a transaction with a home builder. What happens in these type arrangements?
"A. We have the home improvement dealer fill out an application and an agreement which basically states which I could give you a copy of that all of the paper work and transactions that they present to us are legitimate. It is just an agreement type situation. We check out theirsome of their sources that they do business with, run a personal credit check, and then we set them up as a dealer.
"Q. Now, did FNBC have such an arrangement or agreement with Builders Supply, Incorporated?
"A. Yes, sir.
"Q. Back in November of 1979?
"A. Yes, sir.
"Q. Prior to loaning any money on any piece of property on a second mortgage type arrangement what steps does FNBC go to? What do they do with regards to the property?
"A. The dealer calls in a credit application and we check his credit. We verify his credit worthiness. We require them to provide us with a title and a binder stating who the property is listed in, and of course, we give all the documentation that is required by the law of Alabama, because we couldn't leave it up to each dealer to get his own documents so we provide him with the forms to be used. Once a loan is approved, subject to this criteria, and then when the work is finished, the dealer brings in all of the documentation for us to review and make sure that it is properly notarized and so forth.
"Q. Now, in this particular case involving the transaction between Mrs. Lillie Williams and Curtis Walton, also known as Curtis Walton Williams, was there a title search prepared by some legal firm?
"A. Yes, sir.
"Q. I show you what has been marked Defendant's Exhibit 1 and ask you if this is a copy of the title binder which FNBC obtained on this particular piece of property?
"A. Yes.
"Q. Who does the examiner of this particular title list as the owner?
"A. Lillie Williams and Curtis Walton, also known as Curtis Walton Williams.
"Q. And what date does this title binder indicate?

*1369 "A. December 13, 1979."[4]
It is evident that, from the outset, FNBC directed the entire transaction from the standpoint of whether to extend credit, to whom credit was extended, and upon what terms. Apparently, the title company issued its "binder" reflecting joint ownership of the property (notwithstanding the Williams-to-Walton deed) because of the First Federal outstanding mortgage, pursuant to which Mrs. Williams retained certain interests and obligations. For whatever reason, FNBC obviously directed that Mrs. Williams, along with Walton, execute the mortgage conveyance and note.
In view of the Williams-to-Walton deed and its pay off of the outstanding indebtedness to First Federal, FNBC could have elected to deal exclusively with Walton. Instead, it chose to require Mrs. Williams's signature as a condition to its extension of credit. It made this requirement without any personal contact with Mrs. Williams and in recognition that whatever interest, if any, she retained in the property, used by her as her home, was being obligated or surrendered by her execution of the credit transaction documents.
In view of the invalidity of the forged documents as to Mrs. Williams, one question remains: Because she was not in fact obligated to FNBC, did she rely upon FNBC's former position, so as to suffer prejudice as a consequence of its subsequently altered position? The answer lies in the proper understanding of the reliance element of the doctrine. Although some of the cases speak in terms of detrimental reliance, this resultant injury element need not be manifested in a conscious, affirmative course of action.
Reliance may be present in a negative sense; that is, where, as here, FNBC, as an affirmative requisite to its extension of credit, included Mrs. Williams as its obligor, though unknown to her, the law will infer her reliance upon a continuing course of conduct consistent with FNBC's original position. In other words, reliance may consist in following a given course of action; or it may be in the failure to pursue a given course of action. The ultimate test is whether Mrs. Williams's interest as a debtor FNBC's original positionis adversely affected by FNBC's subsequent inconsistent position. If the resultant injury to Mrs. Williams is naturally and consequentially traceable to FNBC's inconsistent positions, the detrimental reliance element is satisfied.
FNBC's contention, in support of the trial court's ruling, stripped of its legalistic sophistication, is a telling one: It says, in effect, if Mrs. Williams executed the loan documents as we intended and as we believed that she had, we owed her the duty of truth-in-lending compliance; but our breach of this duty is excused, because we are the fortuitous beneficiary of Walton's criminal act of forgery.
This "leave us where you find us" contention overlooks one important elementit does not restore Mrs. Williams to her original unprejudiced position. To this argument we can only observe: If the doctrine of equitable estoppel had not heretofore come into being, surely, the facts before us would compel its creation and application. A review of the instant circumstances does not require a hindsight perspective to determine that a continuing course of conduct on behalf of FNBC concomitant with its original position would have protected Mrs. Williams's interests consistent with the consumer-oriented spirit, and beneficient purpose, of the truth-in-lending legislation.
We hold, then, that FNBC, having treated Mrs. Williams as an obligor, is now estopped from asserting that it was exempt from compliance with the Federal Truth in Lending Act. The judgment is reversed and this cause is remanded for an order consistent with this opinion.
REVERSED AND REMANDED.
FAULKNER, EMBRY and ADAMS, JJ., concur.
SHORES, J., concurs in the result.
*1370 TORBERT, C. J., and ALMON and BEATTY, JJ., dissent.
MADDOX, J., not sitting.
TORBERT, Chief Justice (dissenting).
I dissent. The majority fails to recognize that appellant had no interest in the property at the time it was mortgaged by Curtis Walton. Additionally, the theory of estoppel is not applicable under the facts in this case.
An analysis of the legal status of the parties to this transaction supports the trial court's holding. When Lillie Williams executed the deed to Curtis Walton, the property was subject to a mortgage to First Federal Savings and Loan Association of Russell County. At that time, the Savings and Loan Association had legal title to the property and the deed conveyed Mrs. Williams's equity of redemption to Curtis Walton. Thereafter, she had no legal or equitable interest in the property and therefore she was unable to obligate an interest under the FNBC mortgage. The majority opinion is unable to identify what interest Mrs. Williams is obligating under the mortgage: "[W]hatever interest [she had], if any, ... was being obligated" under the FNBC mortgage. (Emphasis added). However, since she had no identifiable legal or equitable interest, I maintain that she was unable to obligate herself under the mortgage and was, therefore, not entitled to notification.
Further, the opinion states that FNBC should not be the "fortuitous beneficiary of Walton's criminal act of forgery." This distorts the facts; FNBC is the "fortuitous beneficiary" of the fact that Mrs. Williams had no legal or equitable interest in the property requiring notification under the Truth-in-Lending Act. In fact, the forgery is irrelevant to whether or not she was an obligor on the mortgage. Even if she had signed the mortgage, she had no interest in the property to convey to FNBC.
The majority also attempts to use the theory of estoppel to prevent FNBC from denying that Mrs. Williams is an obligor entitled to notification. It is clear that reliance is an essential element of estoppel. Traders & Farmers Bank of Haleyville v. Central Bank of Alabama, 294 Ala. 622, 320 So.2d 638 (1975). In the case before us, the majority attempts to infer Mrs. Williams's reliance on FNBC's responsibility to notify obligors. I fail to see that there is any element of reliance in this case. The majority identifies her failure to pursue the right of rescission as the requisite reliance. Even if she had been notified, she was not an obligor under the mortgage and she would not have been able to rescind the transaction.
When Mrs. Williams subsequently voided the deed to Curtis Walton for failure of consideration, she took back only the equity of redemption, since Curtis Walton had conveyed the legal title to the intervening mortgagee. Thus, on failure to repay the indebtedness, a foreclosure sale was proper. It is well settled that any proceeds from the sale over and above the amount of the principal, any interest to the date of sale, plus the amount of the first mortgage paid off by FNBC, would be returned to Mrs. Williams as her equity in the property.
While the facts of this case present a very difficult situation, I would hold that the trial court did not commit error in its order, and I would affirm its holding.
ALMON and BEATTY, JJ., concur.
NOTES
[1] This finding recognizes the controlling statute, § 8-9-12, which provides:

"Any conveyance of realty wherein a material part of the consideration is the agreement of the grantee to support the grantor during life is void at the option of the grantor, except as to bona fide purchasers for value, lienees and mortgagees without notice, if during the life of the grantor, he takes proceedings to annul such conveyance."
[2] For convenience, our use of the term "bona fide purchaser for value" throughout this opinion includes "mortgagees without notice." We further note that the "without notice" requisite refers not to lack of notice of the deed, but to lack of notice of the contingency of consideration of support.
[3] 12 C.F.R. §§ 226.6(e), 226.9(b), 226.603, 226.902 (1981); Gerasta v. Hibernia National Bank, 575 F.2d 580 (5th Cir. 1978).
[4] The Williams-to-Walton deed was recorded in October, 1979.